THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FREDERICK SANDERS (Impleaded), Defendant-Appellant.

(No. 58393; ▮▮▮▮▮▮)

First District (4th Division)—September 26, 1973.

James J. Doherty, Public Defender, of Chicago, (Xavier G. Velasco and Suzanne M. Xinos, Assistant Public Defender, of counsel,) for appellant.

Bernard Carey, State's Attorney, of Chicago, (Kenneth L. Gillis and Larry A. Sultan, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ADESKO delivered the opinion of the court:

Defendant was charged in Indictment No. 70-2841 with the offense of attempt robbery. He was found guilty in a bench trial and sentenced to the State Penitentiary for a term of two to five years. He was also charged in Indictment No. 70-2840 with armed robbery to which he pleaded guilty and sentenced to two to five years. Both sentences were to be served contemporaneously. This appeal is the subject of Indictment No. 70-2841. In it defendant raises two issues: First, that defendant was not properly advised of his rights to a jury trial and that he did not voluntarily waive those rights; and second, that the lineup identification of the defendant was suggestive and conducive to mistaken identity.

A brief statement of facts is in order. On May 10, 1970, at 11 P.M., two men walked into Brown's Fried Chicken take-out store. When they entered there was one customer, Patrick O'Shea, waiting to pick up his order. O'Shea saw the two men. An employee, Sam Lupo, directed the two men to another counter where orders were taken. O'Shea received his order and left. He proceeded out of the parking lot and drove around the block intending to return to the parking lot. A brown Oldsmobile came down the street with no lights, travelling fast. O'Shea testified that the occupants of the Olds looked like the two suspects he saw enter the chicken store.

Meanwhile in the chicken store Bill Murray, the owner of the store, after a short conversation with one of his employees and suspecting something was wrong climbed atop a set of shelves to get his pistol.

He then hung over the top of the shelves, which were about seven feet high, and saw the two men who had entered the store pull out guns, aim them at Sam Lupo, and announce a "stick-up." Mr. Murray then said, "Stop, don't move. I have a gun, and I'll shoot. Turn around and back out. Put the guns away." They turned around towards Mr. Murray and backed past his vantage point, out of the door. When the police arrived Murray described the men as being black, males, moustached, wearing black hats and black shirts. He described defendant, Sanders, as wearing dark pants, 170 to 180 lbs. in weight, five feet nine to ten inches in height and carrying a small chrome .25 caliber revolver. The description given by Mr. Lupo and Mr. O'Shea concurred with that given by Mr. Murray who also stated that "the inside lighting was excellent" and he got a good view of their faces.

Between 11:10 and 11:20 two police officers were on patrol about ten or eleven blocks from the scene of the crime. They spotted a vehicle matching the description given in a report broadcasted on the police frequency and stopped it. Officer Nowdowski observed defendant Sanders with a bulge in his pocket and found a "loaded .25 caliber automatic." Another loaded pistol was found under the car seat. Defendant Sanders stated that he found a briefcase with four pistols in it and was walking to the police station to turn it in. Sanders saw his friend Harris drive by and asked him to drive to the station. Sanders then decided he needed other identification so they turned around to go back to defendant's apartment. That is why the car was headed away from the police station and the scene of the crime, at the time the defendant was apprehended.

Defendant was transported to the police station where after being advised of his constitutional rights he stated that he was thrown on the floor for ten minutes and kicked. But when he identified his picture in the lineup, which preceded immediately the alleged beating, defendant Sanders admitted that there was not dirt on his shirt or bruises on his face.

We disagree with defendant's claim on appeal that he was improperly advised of his right to a jury trial and that he did not knowingly and understandingly waive a jury trial. The trial record reads as follows after the trial commenced:

"THE COURT: Sign the jury waiver. For the record, Mr. Sanders and Mr. Harris, you each realize that you have a right to a trial by jury, you understand that?

Mr. HARRIS: Yes sir.

Mr. SANDERS: Yes sir.

THE COURT: And, by signing this document entitled 'Jury

Waiver', you are submitting the case to the court for its decision rather than jury of twelve men, you understand that?

Mr. HARRIS: Yes sir.

Mr. SANDERS: Yes sir.

THE COURT: You may proceed, Mr. Boback. (Assistant State's Attorney)"

Attorney Chester Blair, a private attorney chosen by the defendant appeared for him and was sitting next to the defendant during the admonition. Mr. Blair discussed the jury waiver with his client and concurred with the in-court waiver. We are mindful of the fact that in Illinois there is no precise standard to determine if a defendant has made an understanding jury waiver and that the facts of each particular case must be examined.

Defendant cites, in support of his contention, the case of *People v. Rivera*, 34 Ill.2d 575, which is readily inapplicable. In *Rivera*, the trial judge appeared to be upset after defendant first asked for a bench trial and changed his mind the next day. The instant trial of Sanders is in no way comparable to the *Rivera* decision.

■■ Defendant also cites *Boykin v. Alabama*, 295 U.S. 238 (1968), dealing with a guilty plea, to show that a silent record is insufficient to demonstrate intelligent waiver of a constitutional right. The record in the instant Sanders' trial is not silent on the question of a jury waiver. The trial court explained to the defendant that he had a right to a trial by jury. Defendant replied that he understood. The trial court then explained that by signing the waiver defendant was "submitting the case to the court for its decision rather than (a) jury of twelve men." Defendant replied that he understood that. There was no objection to the court's method of admonition by either the defendant or his counsel. It is our opinion that the defendant knowingly and understandingly waived trial by jury.

■■ We also disagree with defendant's second claim on appeal that the lineup identification was suggestive and conducive to mistaken identification of the defendant. Subsequent to the attempted robbery Mr. Lupo described the assailants as having worn black short-sleeve shirts during the attempted robbery. Defendant contends that the lineup identification was unfair, because defendants were the only two participants wearing black shirts. The test to determine the propriety of a pretrial identification is stated in *Stovall v. Denno*, 388 U.S. 293 (1967). The court must examine the totality of the circumstances surrounding the lineup to determine whether it was "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to constitute a denial

of due process. In examining the totality of the surrounding circumstances, and the unwaivering identification by the three eyewitnesses, the lineup was not "unnecessarily suggestive and conducive to irreparable mistaken identification."

The three witnesses were able to observe defendant under excellent lighting conditions within the carry-out store. Mr. Murray's perch, atop the shelving bins placed him in an excellent position to observe the defendant. Mr. O'Shea also saw defendant well enough to warn Mr. Lupo of his suspicion about the defendant. Mr. Lupo talked to the defendant when he entered with his partner. This opportunity gave Mr. Lupo adequate time to observe the defendant.

We are satisfied that the defendant was properly identified and there is no basis for defendant's claim that his identification was conducive to mistaken identity.

The decision of the trial court is affirmed.

Judgment affirmed.

BURMAN, P. J., and DIERINGER, J., concur.